Good morning, Your Honours. Jeffrey Zuber of Zuber & Tellu, appearing on behalf of Plaintiff Appellants, GG-110 Productions and Gerald Wayne Harbour. Maybe keep your voice up. Excuse me, Your Honour? Keep your voice up. Yes, Your Honour. Sorry. Appearing on behalf of Gerald Wayne Harbour and GG-110 Productions Incorporated. The issue before the Court is actually entrenched in one seminal case that both parties have quoted at length, Daystar at 539 U.S. 23. The issue in particular is whether the Copyright Act precludes application of the Lanham Act to communicative works such as films or, in this case, musical cues that are later incorporated into films or television series. There is a seminal distinction between the case at Barr and the situation in Daystar, which Daystar actually addressed in dicta. And what happened in Daystar was there was a manufacturer of a work that later was subsumed into another work with very minimal changes. But the Court in Daystar found that those minor editing changes were enough to change the origin of that work. I thought the Court said as long as you didn't get the other guy's stuff and tear the label off and paste your own on, you're okay. I believe that is an accurate representation of what the Court said. It said if they did repackage the goods as their own, that there would have been a case here in Daystar. The important part of that dicta was that they didn't qualify it in any respect to the Copyright Act. They said if you repackage someone else's goods, even if it's a communicative work, that may be a violation under the Lanham Act. And I am talking about page 36, 539 U.S. at 36. Now what happened here is exactly what they were talking about in that dicta. It was addressing the very same point. In our case, what we have alleged is that they've taken what our a manufacturer of an engine. If someone, if they license that to someone else to sell to Ford or to Chrysler to put in their cars, that middleman cannot claim that they were the manufacturer of the engine outside of written agreement or work for hire situations, which is not what occurred here. They cannot just say that that's their engine and take credit for it in the stream of commerce and mislead the consumers. In this case, the consumers would actually be Ford and not the purchasers of the car, the end product. In other words, just because the engine is later subsumed in another product in the stream of commerce, doesn't mean their rights under the Lanham Act are extinguished. How were consumers misled? Well, in this case, Your Honor. In this case. When we looked at the credits that are afforded different entities under Moesha or the different television programs, Sister Sister, sometimes we would see our client get the credits and sometimes they would not. And this is IMDB, a very popular site amongst the consuming public and people in the industry. So when they would go to this site, producers, people who actually look for people to make these cues for their television shows, they would see Farquhar rather than Harbor. They would see a different person. They would contact that different person. They would not go to the actual source of the goods, which in this case, in many cases, was my client. Did your client produce something that was immediately used by Farquhar or was it part of something bigger that was used by Farquhar? Well, in some cases, we believe that Farquhar actually did make some changes. And in that case, we would not have a claim under the Lanham Act pursuant to the reasoning in Daystar. I don't understand that distinction that you keep making. As I look at Daystar, what Daystar is concerned about is that you do not go out and take somebody's tangible property, like your videotape, and tear off the label and paste your name on it. But Daystar was not seen to me, as I read it, and I hear what you're saying. But what's the meaning of Daystar? The problem isn't that you didn't make changes. The problem is that all you did was you stole the copyrighted material. As if I stole a book, I took your book and published it in my name. Now, if I took the book hardbound and tore off the cover and put my cover on it, that's one thing. But if I took the intellectual content of your book, even all the intellectual content, what's the meaning? Like what Daystar is saying, listen, that's a copyright problem. If it's not a copyright problem, then every real vile copyright infringement becomes a Lanham Act case. And that ain't what the court was saying. It seems to me they were making that distinction. Am I stealing the intellectual content, or am I stealing an actual thing? Now, tell me where the court says something different from that. I keep reading it, and I hear you, and I read it again, and all I see is the court talking about tangible versus intangibles, basically. Your Honor, I agree with your assessment, obviously, with regard to what the court has said. They're holding, and again, I'm relying completely on the dicta, and it may have been something that had not considered this problem. I do not believe that the Copyright Act preempts the Lanham Act for when they overlap. And again, I'm relying on the dicta at 539 U.S. 36, where they say they don't even talk about intellectual property rights as being part of what – and certainly it is. How do you confirm a copyright action in this case? Is it because you let the statute of limitations run, and it was too late? Your Honor, the facts, as given by our clients, there was no copyright infringement. There was a valid license, and being paid pursuant to that license was the crux of the claim, part of it. There is a breach of contract claim in here because they weren't being paid the rates they were supposed to be paid. So from our understanding of the law, if there is permission, there is a license, and there's no infringement. So you still proceed on the breach of contract, or is that gone, too? That was released. Voluntarily dismissed? Yes, Your Honor. Well, no, the court failed to retain jurisdiction over the supplemental state law claim. State law claim. Yes, Your Honor. So you can still proceed on that? Yes, Your Honor. What did your licensing contract say about screen credits? Well, this is one of those messy issues where it was an oral contract, and it is a question of intent. But you can see the intent of the parties put forth quite clearly in the fact that our client retained 50 percent of the composition rights and was getting paid. And in fact, it was when these rights changed, when it got reduced from 50 to 25 percent, that my client was actually alerted, hey, what's going on here? Started doing some research on the Internet, and this was in 2004, when my client finally said, hey, I'm not even getting the right credits. Very soon after that, we were retained and we filed suit. Again, under our interpretation of what happened here, the facts, there was no infringement. There was just failure to pay according to the license that was given and failure to attribute. There was no – it was not a work-for-hire situation, in other words, Your Honor. He still retained his rights. Was there sort of a standard form of contract that you find in these situations? Yours was oral. Ours was oral, Your Honor. Is there kind of a standard form of a contract in this industry? Standard is a funny word. I've seen some of the contracts, and work-for-hire will specifically set forth work-for-hire. In fact, if there is no work-for-hire contract, nothing written, it's very difficult for someone to claim that's what happened. But of course, it's the intent of the parties that controls, and you can look and see if someone was an employee and getting paid and so forth. But in this case, that's not what happened. And again, a very good indicator of that is the fact that our client retained 50 percent of the composition copyrights and was getting paid pursuant to those rights. Well, how did all this fit in, this cue that your client developed? It's hard for me to visualize how all this stuff works. Your Honor, what happens, I believe in most cases, and perhaps it didn't work this way on every single case, I imagine sometimes there are mistakes, but sometimes what happens is they talk about the music they want, they make the actual cartoons or shows, and my client will watch them, will sync music to the particular show. There will be a time where, let's say they will need seven seconds of music, or 15 seconds of music, or so on and so forth, and it's something we don't think about, but it's inherent in every TV show we watch. The music is there. My client is someone who provides those services and creates those cues, puts them on tape so that they're perfectly sunk to the end product. And what happens is if he's not allowed to take credit for that... How does a cue sound? Whatever music is put on there, for instance, in a lot of cases, in this case, it was just instrumental. In fact, I don't believe my client did any vocals whatsoever, but it's just synced with the television show, and sometimes the same cue will be used. How does it go? I mean, what does it sound like? Oh, it's music. Actually, a lot of it sounds very similar. There's often very subtle distinctions within the same show. Does your client take this just for the lead-in of the start of the TV show, or does it provide this background for each individual segment, and then license it to Farquhar? Both, Your Honor. Does the beginning and does the intermittent things. If there's a high-tension area, for instance, you'll have louder orchestral-type arrangements. But basically, all the music that you will see in these shows, and if you watch any of these shows, you'll hear it through and through. You don't think of it now, but someone is actually taking the time to think, okay, I need seven minutes of music. Sometimes it'll be very simply just cutting, and there wouldn't be much work at all. Sometimes he has to change what's on there so that it will fit neatly into that seven-second window. But he looks at it, and it's an artistic decision, and he'll say, okay, we need this, so we can go with the main intro music, or we have to change it and do something different. Very often, the two would collaborate. Mr. Farquhar and Mr. Harbour would collaborate. Are they still working together to doing this? Are they still working together today, Your Honor? Yes. No, they're not, Your Honor. Are they split up because of this? Yes, Your Honor. Okay. Actually, I believe the relationship may have ended before this. Okay. But my client was still receiving royalties pursuant to his composition rights. So if Farquhar was producing something and had some soap opera or something, then he would come to your client and say, I want seven minutes of background music. Your client would look at what the show was about, or he'd just kind of go on, well, it's a love story, so I'm going to have some love music or something like that. Is that the way it went? Well, he would look at it. There was some artistic decisions involved, but there was basically time. We need this certain amount of music. And there was some type of collaboration, and there was some indication of what was wanted from Farquhar in certain instances. But it was original music from my client, Gerald Wayne Harbour, NGG 110 Productions. He made artistic decisions. And again, there was a lot of different situations. Sometimes they would work  Does my client have a copyright on the music? I don't believe he registered a copyright on any of the music, but I don't think he did. Well, you don't have to do much. You just put the initial and the circle in there. Yes. Again, I don't know what happened with that, Your Honor. We didn't have to Why don't we hear from the other side and save some time for rebuttal?  Good morning, Your Honors. Tracy Roman from Raskin, Peter, Rubin, and Simon on behalf of Defendants and Appellees, Kirk Farquhar and Farquhar Productions, Inc. Your Honors, as Judge Fernandez pointed out, the issue is not whether minor edits were or were not made to the music cues at issue in this case. The issue is whether Section 43A of the LAM Act provides a cause of action for misattribution of credit on a communicative work. The Supreme Court, in a unanimous decision in Daystar, has stated that it does not. Well, he's gone on a dictum in the case. Is there a dictum that supports his position? Your Honor, I believe that the dictum that indicates that minor edits were made to the campaign, which was at issue that had been copied, the video of the campaign that had been copied and reproduced, was only to point out that although portions of it were copied wholesale, there were portions that were added. For example, a new introduction was added that was individual product, so it might have provided a problem with certain portions of the copyright action claim. But the dictum in that case was not intended to indicate that the holding that a communicative product cannot receive protection under the LAM Act should only turn on whether or not minor edits were made to, or any edits were made to that communicative product. It doesn't remove the problem that the Court faces with giving protection to a communicative product, such as the intellectual property rights in a book, as Judge Fernandez pointed out, or in this instance, the music. It is the music that the TV producers are purchasing, or rather, the right to sync the music to the video shows that they are producing. It is not whether or not the music comes with certain changes, or whether it comes from counsel's client or my client. The services that the TV producers purchased from my client were to obtain the right to license the music to sync it to the video. And that is what was given to the TV producers. Who did the syncing? Did your client do that, or the plaintiff? Your Honor, unfortunately, the Second Amendment complaint is unclear on that. Although there are portions of the Second Amendment complaint where it indicates that what the plaintiff provides is, as counsel indicated, plaintiff will receive a rough cut version of the television show with time codes in it, and a cue sheet that indicates where the producer wants music inserted. The plaintiff would then prepare the music to insert into that and sync it up so that it can be combined with the television show into a single format. In certain instances, that could be done and provided to my client as one DAC tape with the show already on it, or it could be provided separately with just the music cues provided. But if I may, in certain portions of the Second Amendment complaint, I believe plaintiffs allege that the music cues are provided, properly synced, but that they're provided to Farquhar for final syncing to the completed show. In other words, what is provided to the TV producer is not what was provided, according to that allegation, is not what was provided to my client. Therefore, it would fall directly under Daystar, where we're not talking about the situation where we're given, for example, an album or a CD, and we've just taken off the label, put on our own label, and provided it to the TV producers and said, here you go, here's the product you asked for. Instead, we're given something that we then have to do something further with, which is to sync it to the final television show. Does your client change the musical suggestions at all, or just sync it? Your Honor, it's possible that they did in certain circumstances. We don't know that from the Second Amendment complaint, which is one of the problems with this issue is that the court, Judge Fischer gave plaintiffs an opportunity to amend the complaint after briefing and oral argument regarding the Daystar case and the problems that the complaint faced with the Daystar case, and instructed plaintiffs what they needed to do in order to amend their complaint to try and plead around Daystar. In fact, the court specifically said that what is lacking from the First Amendment complaint was what plaintiffs gave to the defendants, or what defendants gave to the television producers or the film producers. And that's at Excerpts of Record 24. In the Second Amendment complaint, failed to address that second flaw. What was it that Farquhar gave to the defendants, the television producers? And Judge Fischer held in Excerpts of Record 92, plaintiffs do not allege that defendants sold the tangible product. In other words, the DAT tape that was provided to Farquhar from the plaintiffs, or the CD-ROM that was provided to them that the plaintiffs allegedly produced. They refer to themselves as the producers of musical goods and services that are sold and or licensed to various television and film production companies. In addition, they refer to digital media containing their music that they gave to defendants. However, plaintiffs do not assert that defendants actually gave this digital media to the television show producers. And the court was referring to Paragraph 14E and 15s G through H of the Second Amendment complaint. It's also that very same Paragraph 14E at Excerpts of Record 32 to 33, where plaintiffs allege that the contents of the DAT tape that they provided to defendants, which they claim could not be altered or changed, but it was provided to defendants for final syncing to the completed television show. In other words, what defendants had to do to provide to the television producers was perform an additional function, sync it to the final television show. It was not a repackaging of the goods that were provided to the defendant, which would be a proper Lanham Act claim according to Daystar. What do they call this cue? Where does that term come from? It's actually sort of an old television show music composition idea. And cues go throughout the industry so that BMI and ASCAP and performance rights societies know how to pay the various artists. But think of it nothing more than just music. It's just it could be five seconds of music as opposed to an entire song. So, for example, when live performances used to occur and you would have somebody sitting at a piano or an orchestra sitting with a conductor and they would play along with the live action as it was happening right in front of you, sometimes it would be silent, sometimes there would be someone walking across the stage and playful music occurring for two seconds. Those are all cues. The difference now is that they do it with the television show in front of them ready to run and they can say here's where the producer wants music inserted and it's a happy scene or it's a tense scene or it's a romantic scene and they create a certain amount of music as dictated by the television producer to be inserted into that. And those are called cues because they're cued up to a certain time in the television show when they have to be inserted. And these are original compositions? The hope is that they're original compositions, certainly, but they don't necessarily have to be. And that returns to what Justice Scalia said was one of the problems with providing a Lanham Act violation for misattribution of credit is that how do you ever know who were the originators of the communicative product? What if Harbor, instead of creating original cues, borrowed some piece from some other artist or hired a subcontractor and didn't inform the other parties about it? Those problems are addressed through a Copyright Act, but to say that they have to be given credit through the Lanham Act, otherwise it's a false designation of the origin of the music, creates a problem that the Lanham Act was not intended to address, but that the Copyright Act was. We're not saying that plaintiffs don't have other remedies here. It's just that this particular remedy is not the proper remedy when what they're seeking to do is protect their creative content. Do we know the origin of these musical pieces or cues at all as it stands on the complaint? The Second Amendment complaint alleges that these were original creations by the plaintiff. Were all original? Yes, Your Honor. So you're saying that still doesn't fit under the Daystar case? No, because the Daystar case wasn't concerned with whether or not it could be proven that you only need to give credit to a single individual, or that if you could track the chain of title, then there is no problem and you should go ahead and afford credit. What it simply holds is that misattribution of credit, or the failure to give credit for creative product, for intellectual property, for the expression of an idea, as opposed to a tangible good, cannot be protected under the Lanham Act. The distinction is Defendant Farquhar was not taking, for example, a CD of ten songs written by the plaintiff and selling that CD, going to a music store and buying ten copies of the CD and repackaging them as his own and selling them. What he was selling to the television producers was the music itself, not the DAT tape or the CD-ROM on which it was provided from plaintiffs to defendants. And that's what Judge Fischer recognized was the failing with the second amended complaint. It did not allege what it was that the defendants provided to the TV producers, because it couldn't. It couldn't allege it to get around Daystar. Well, what is the custom in the industry as far as giving credit for cues? It's usually based on agreement, Your Honor. Typically, for example, in this case, if I may, Defendant Farquhar was acting effectively like a publisher of the music. Music publishers typically have a written agreement with composers or musicians who provide cues for television shows and films, and the agreement usually states what level of credit is to be given. Oftentimes the work is a work for hire, so no credit is given, depending on the circumstances with the television producers and the film producers. So the industry is a negotiable issue. And your remedy, in addition to a potential copyright infringement action, is the breach of contract for failure to attribute the credit. And your position is this was a work for hire? No, Your Honor. I was just giving you an example of certain ways in which the industry deals with this. I don't believe that issue was actually before Judge Fischer on the motion to dismiss the Second Amendment complaint. It didn't become ‑‑ it's not an issue for purposes of the Lanham Act violation. But the plaintiff still has a right to claim a breach of contract under State law. Yes, Your Honor. As I recall from Judge Fischer's judgment dismissing the complaint, the State claims were dismissed without prejudice for them to be refiled in the State court, which plaintiffs have not chosen to do. Has their time run out now? Or do they still have time? Your Honor, honestly, I haven't looked into the issue of whether it would be relation back or not for purposes of whether their initial filing would have stalled the time for running. But under the oral contract ‑‑ California does toll. So it would have been a two‑year statute of limitations for the breach of contract oral and then four for the written. So I'm not quite sure. I haven't done the math yet. Your Honors, I'd just like to point out ‑‑ Let me ask you these digital cues. Why should they be considered components? Or why does that designation matter? Your Honor, first, I don't think that it does matter for purposes of Judge Fischer's determination or for this ruling. I think where it gets a little bit confusing is that if you look at Daystar and you think about the services that were provided or the goods that were supposedly provided in that case. And this goes back to Your Honor's question regarding whether or not there were edits or changes made. In Daystar, the completed film that was the subject of the dispute involved segments that had been taken from the campaigns video and then additional works that were added to the beginning and end. So you could look at that segment as a component. And it doesn't make a difference that it was only one component. The fact is still that the entire product was what was represented to the public was the defendant's goods, not the plaintiff's goods. And that does not result in a reverse passing off. Another case that dealt with this issue, if I may. It was Bretford Manufacturing, Inc. versus Smith System Manufacturing Company, 286 F2nd 969. And that case is out of the Northern District of Illinois from 2003. In that case, the defendant had taken a table leg that had been provided to him by the plaintiff and incorporated the table leg into a sample table, which was then offered for sale. And the court said that it makes no difference that the defendant acquired the table leg, which was only a component of the table from the plaintiff, because the district was not concerned with the source of the component parts. It was interested in a table that conformed to the bid specifications, and the sample met that requirement. So it really doesn't matter whether we're talking about a component, whether the music cues are only a component of the finished television show, or whether it is the product itself, it's still a communicative product. That was what was being sold, and that's what the Second Amendment complaint repeatedly alleges was misrepresented to the television producers. The closest they come to saying what was misrepresented is that defendants represented to the television producers that they had created the music, as opposed to giving proper credit to the plaintiffs for having created the music. It wasn't about whether or not a tangible product being sold in the marketplace had had its label removed and replaced with defendants' labels. It was about whether or not intellectual property was being given proper credit. And again, Baystar has spoken on that issue. Now, if I might point out that counsel kind of emphasizes the problem with affording Lanham Act protection to communicative products. On the one hand, he argues that plaintiff's name was not given credit in the television show, in the completed television show, and that if you look at IMDB or other websites looking for the credits afforded, you're looking for the credit afforded to providers of segments or components of the television show, and that is the essence of their harm, as it's alleged. Yet at the same time, they want you to ignore that it's the final television show that's at issue and instead focus on what did defendants provide directly to the television show producer, and they need to do that in order to overcome Daystar. But they can't have it both ways. If the credit about which they're complaining is the credit not afforded on the television show, which is shown in various places in the Second Amendment complaint, then they can't say, but at the same time, ignore that for purposes of allowing us to maintain our claim under Daystar and instead look at what was represented to the television producers. It's not really at issue here. What the television producers were buying was the music and the right, more importantly, the right to license, to sync that music to the television show. They weren't buying a prepackaged good with somebody else's label on it. Your Honors, unless the Court has any further questions, we'll go ahead and submit, because we think our brief has covered the rest of the issues. So what you're saying is that the producers of the product, they were just buying these cues, and just like they'd go out and buy some nuts and bolts at a hardware store, and then those cues became part of the finished product which your client created. Not which our client created, Your Honor, but which our client provided services to the television producers for. The television producers create the final product, which is the television show. Your client was a middleman, sort of. Yes, basically a broker, someone who procures certain music and who, it's unclear from the complaint, but may have also provided their own music in conjunction with it. This is fundamentally the problem that Judge Fischer found with the Second Amended Complaint. It simply doesn't say, nor can it allege around Daystar what was provided to the television producers, because the only thing that was provided was the music. And, Your Honors, I'll just point you to excerpts of Record 33, 35, 37, and 38 for examples of how the Second Amended Complaint could not be amended further to plead around Daystar, where it points out that Defendant would license the aforementioned musical compositions to various television and or film production studios for use in television or film scores. Defendant's licensed cues to the producers of the television series for use in various episodes. Several plaintiff's synchronized compositions were licensed to the producers of the television series, Sister, Sister by Defendant. Everywhere in the complaint that's alleged what was provided to the television producers makes it clear that it was the music and not some tangible good, and the distinction cannot be drawn to remove this case from Daystar. Thank you, Your Honors. Thank you, Your Honors. Thank you, Your Honors. Paragraph 43, page 23 of the Second Amended Complaint, reads, In an attempt to entirely pass off the services of plaintiffs as their own, defendants have a. acquired plaintiff services, b. caused plaintiffs to affix the results of their services on digital media, c. represented to television show producers and feature film producers that they, defendants rather than plaintiffs, had provided the musical services, d. as a result have received published credits for such services, which e. is likely to cause confusion or to cause mistake or to deceive as to the origin, sponsorship, or approval of plaintiff services or commercial activities by another person. It doesn't specifically say that there was a changing of labels. It doesn't talk about that. Certainly with the liberal pleading standards in the federal courts, I think an amendment isn't even necessary, that it certainly is implied simply by that language. Nevertheless, even if Judge Fischer found an amendment to be necessary, certainly it would be easy to say upon information and belief the labeling was changed. Another thing that was discussed very much, it seems to me that there's the stream of commerce, and I know I've discussed this a little bit before, but the fact that it's later subsumed into another product seems to be a big issue, and it should not be. The consuming public in this case are the TV producers, and the injury that is occurring is exactly the type which the Lanham Act is meant to prevent. Other people out there in the street, because there was a misrepresentation to the television producers by Mr. Farquhar, there is this result out in the marketplace where other people, it's being passed along, and people think that the wrong person made these goods. They'll watch the show and think that someone else handed these DAT tapes to these TV producers. Someone else made them, and it will cost my client business, it will cost him contacts. People will not go to him. They will go to Mr. Farquhar to say, can you give us some more of this, what you've delivered to the producers from Malaysia? If they had taken it as a copyright violation, then everything you said there would apply to a copyright violation, it seems to me. If I took the music that was yours, and I gave it to somebody else and said, this is my music, I didn't rip your labels off it, you just gave me the stuff, and I took it and said, this is my music, everything you say here would be the same if I were violating your copyright, would it not? In this particular instance, yes, Your Honor. Like in Daystar, there are a lot of copyright issues, but again, I do not... Now, I'm not saying there are a lot of them. I said everything you say here is a copyright violation. Is it not? Yes, Your Honor. It would be a copyright violation. Do you know what Daystar was trying to avoid? To mixing up the copyright and the Lanham Act violations, saying, look, Lanham Act's talking about one thing, copyright's talking about something else. We don't want them meeting. I agree up until the point, Your Honor, about the meeting part. I believe Daystar was strictly to determine the origin of goods within the meaning of the Lanham Act, to define the term origin, and not to cause, to have any preemptive effect with copyright law, with patent law. For instance, the issue, the example that I gave earlier, and that's in the brief with regard to an engine in the car, certainly there are patent rights in that engine. Certainly, if you can sue under those patent rights, you would want to. Just like in this case, if we could sue under copyright, we would like to and avoid the likelihood of confusion element that you have to prove in a Lanham Act case. Confusion as to whom? Excuse me? Confusion as to whom? Confusion as to TV producers who are going to purchase these types of goods and services in the future. Have you shown any of that? It will be difficult to show, but we've alleged it, and that should be sufficient for the complaint, Your Honor. If you can't prove this copyright-wise, let's say, so that you didn't copyright this stuff, and you could have, but it got played and it's out in the public domain, this would be exactly like Daystar, wouldn't it? Yes, Your Honor. Wouldn't it? With all the discussion about the intellectual property rights, and again, that's why I admit it is dicta, but it's important in that it qualifies what Daystar was trying to do in determining the definition of origin. Sure, but I'm saying that's exactly what this would be, wouldn't it? It would be precisely like Daystar. The only question is whether you blew it by not copyrighting. For example, on my example, if this stuff had gone in the public domain because of mistakes and not taking the right copyright steps, such as they are still, by not taking those, then this would be a Daystar case all over again, wouldn't it? It would be much more similar, yes, to Daystar. So your case all hinges on that the copyrighted stuff didn't go into the public domain? The copyrighted material did not go into the public domain. That's what your case is hinging on now. You say, oh, well, if it was in the public domain, it's one thing, but if it's not, it's something else. Is that right? Your Honor, what I'm trying to draw, the point in bringing up the dicta again and again, and I apologize for continuing to go back to it, but what they said was there would be a Lanham Act claim if they simply repackaged it. Again, if it wasn't out of the public domain, it would be a copyright claim as well. They were not intending to exclude copyright claims, Lanham Act claims, wherever the copyright claim may apply. And again, that dictum is very specifically addressing that point, that we're not trying to rule out patent law or copyright law or anything like that. We're just saying that we're talking about the Lanham Act is meant to protect the goods, and that's what we're here to talk about. That's what my plaintiff is alleging was misappropriated, that these DAT tapes were presented to TV producers, and whether a label was ripped off or whether he handed these to the producers in a bin that said Farquhar's DAT tapes, however, he misrepresented the origin of those goods to the TV producers. The result is evident in the marketplace. People think the wrong person made it, and that should be sufficient for a Lanham Act claim. Thank you. Thank you, Your Honor. Thank you. The matter is submitted.
judges: Pregerson, Fernandez, Siler